

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| FEC IP LLC, | § § § | Case No. |
| | § | **<u>JURY TRIAL DEMANDED</u>** |
| Plaintiff, | § § | |
| v. | § § | |
| GOOGLE LLC, | § § | |
| | § § | |
| Defendant. | § § | |

## <u>COMPLAINT FOR PATENT INFRINGEMENT</u>

Plaintiff FEC IP LLC ("FEC" or "Plaintiff") for its Complaint against Defendant Google

LLC. ("Google" or "Defendant"), for patent infringement, alleges as follows:

### <u>THE PARTIES</u>

1.      FEC is a limited liability company, organized and existing under the laws of the

State of Texas, with its principal place of business located at 104 E Houston St., Ste 140, Marshall,

Texas 75670.

2.      Defendant Google is a Delaware corporation and maintains its principal place of

business located at 1600 Amphitheatre Parkway, Mountain View, California 94043, and may be

served with process via its registered agent, Corporation Service Company located at 251 Little

Falls Drive, Wilmington, Delaware 19808. Upon information and belief, Google does business in

Texas, directly or through intermediaries, and offers its products and/or services, including those

accused herein of infringement, to customers and potential customers located in Texas, including

in the judicial Eastern District of Texas.

## JURISDICTION AND VENUE

3.      This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq*. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, 1338 and 1367.

4.      This Court has specific and personal jurisdiction over Defendant consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long Arm Statute. Upon information and belief, the Defendant has sufficient minimum contacts with the forum because Defendant transacts substantial business in the State of Texas and in this Judicial District. Further, Defendant has, directly or through subsidiaries or intermediaries, committed and continues to commit acts of patent infringement in the State of Texas and in this Judicial District as alleged in this Complaint, by, among other things, offering to sell and selling products and/or services that infringe the Patents-in-Suit.

5.      Venue is proper in this Judicial District pursuant to 28 U.S.C. §§ 1391 and 1400(b). Google is registered to do business in Texas and, upon information and belief, Google has transacted business in the Eastern District of Texas and has committed acts of direct and indirect infringement in the Eastern District of Texas. Google has regular and established places of business in this Judicial District as set forth below and is deemed to reside in this Judicial District.

6.      Google is a multi-national technology company that collects, stores, organizes, and distributes data. In addition to its service model for distribution of data (e.g., movies, search results, maps, music, etc.), Google has an expansive regime that gathers data on residents of this District through the hardware devices it sells (e.g., phones, tablets, and home audio devices) and, also, through the operating systems and apps it provides. As an example, Google gathers data when a

resident runs its operating systems and apps (e.g., location services).[1] As another example, Google gathers data when a resident interacts with Google's plethora of services such as search, email, music, and movie streaming. *See* https://safety.google/privacy/data/ (indicating that Google gathers data from "things you search for," "Videos you watch," "Ads you view or click," "Your location," "Websites you visit," and "Apps, browsers, and devices you use to access Google services"). As yet another example, Google gathers data from "where you've been," "everything you've ever searched—and deleted," "all the apps you use," "all of your YouTube history," "which events you attended, and when," "information you deleted [on your computer]," "your workout routine," "years' worth of photos," and "every email you ever sent."[2] In addition to extensive data gathering of information on residents of this District, Google has a substantial presence in this District directly through the products and services Google provides residents of this District (some of which also gather data).[3]

7.    Google describes itself as an information company.[4] Its vision is to provide access to the world's information in one click, and its mission is "to organize the world's information and make

---

[1] *See e.g.*, "AP Exclusive: Google tracks your movements, like it or not," https://apnews.com/828aefab64d4411bac257a07c1af0ecb/

[2] *See* https://www.theguardian.com/commentisfree/2018/mar/28/all-the-data-facebook-google-has-on-you-privacy

[3] Non-limiting examples include Google Search, Maps, Translate, Chrome Browser, YouTube, YouTube TV, Google Play Music, Chromecast, Google Play Movies and TV, Android Phones, Android Wear, Chromebooks, Android Auto, Gmail, Google Allo, Google Duo, Google+, Google Photos, Google Contacts, Google Calendar, Google Keep, Google Docs, Google Sheets, Google Slides, Google Drive, Google Voice, Google Assistant, Android operating system, Project Fi Wireless phone systems, Google Pixel, Google Home, Google Wi-Fi, Daydream View, Chromecast Ultra.

[4] *See* "This Year's Founder's Letter" by Alphabet CEO, Sundar Pichai, https://blog.google/inside-google/alphabet/this-years-founders-letter/

it universally accessible and useful."[5] Making information available to people wherever they are and as quickly as possible is critical to Google's business.

*Google Global Cache (GGC)*

8.    Google's CEO, Sundar Pichai, explained, "We want to make sure that no matter who you are and where you are or how advanced the device you are using . . . Google works for you."[6] To meet this goal, Google developed a content delivery network that it calls the Edge Network.

9.    One non-limiting example of physical presence in this Judicial District is Google's Edge Network. Google provides web-based products and services, such as Google Maps, Find My Device, and Google Chrome, to users throughout the world, including in this Judicial District. These products and services are in high demand. Google reports that the Android operating system has more than 2 billion monthly active devices, and Google Maps surpassed 1 billion users as of May 2017.[7]

10.    Google's Edge Network, itself, has three elements: Core Data Centers, Edge Points of Presence, and Edge Nodes.[8] The Core Data Centers (there are eight in the United States) are used for computation and backend storage. Edge Points of Presence are the middle tier of the Edge Network and connect the Data Centers to the internet. Edge Nodes are the layer of the network closest to users. Popular content, including Google Maps, Google Messages, mobile apps, and other digital content from the Google Play store, is cached on the Edge Nodes, which Google refers to as Google Global Cache or "GGC."

---

[5] https://panmore.com/google-vision-statement-mission-statement
[6] https://time.com/4311233/google-ceo-sundar-pichai-letter/
[7] *See* https://venturebeat.com/ai/android-passes-2-billion-monthly-active-devices.
[8] https://peering.google.com/#/infrastructure

11.    Google Global Cache is recognized as one of Google's most important pieces of infrastructure,[9] and Google uses it to conduct the business of providing access to the world's information. GGC servers in the Edge Nodes function as local data warehouses, much like a shoe manufacturer might have warehouses around the country. Instead of requiring people to obtain information from distant Core Data Centers, which would introduce delay, Google stores information in the local GGC servers to provide quick access to the data.

12.    Caching and localization are vital for Google's optimization of network resources. Because hosting all content everywhere is inefficient, it makes sense to cache popular content and serve it locally. Doing so brings delivery costs down for Google, network operators, and internet service providers. Storing content locally also allows it to be delivered more quickly, which improves user experience. Serving content from the edge of the network closer to the user improves performance and user happiness. To achieve these benefits, Google has placed Edge Nodes throughout the United States, including in this Judicial District. Google describes these Edge Nodes as the workhorses of video delivery.

13.    Google's GGC servers are housed in spaces in this Judicial District leased by Google. Google's GGC servers are housed in spaces leased by Google from Internet Service Providers ("ISPs"), whose networks have substantial traffic to Google and are interested in saving bandwidth. Hosting Google servers allows ISPs to save both bandwidth and costs, as they do not incur the expense of carrying traffic across their peering and/or transit links.

14.    When an ISP agrees to host a GGC server, the parties enter into a Global Cache Service Agreement, under which Google provides:

---

[9] https://blog.speedchecker.com/2015/11/30/demystifying-google-global-cache/

- hardware and software—including GGC servers and software—to be housed in the host's facilities;

- technical support; service management of the hardware and software; and

- content distribution services, including content caching and video streaming.

In exchange, the host provides, among other things, a physical building, rack space where Google's computer hardware is mounted, power, and network interfaces. All ownership rights, title, and intellectual property rights in and to the equipment (*i.e.*, the hardware and software provided by Google) remain with Google and/or its licensors.

15.    Multiple ISP-hosted GGC servers are in this Judicial District. Google provides the location of its GGC servers, namely, Sherman, Tyler, and Texarkana.



16.    On information and belief, Suddenlink Communications, now Optimum, for example, is an ISP that hosts GGC servers in Tyler, Texas.

17.    On information and belief, Cable One, now operating under the brand Sparklight, is an ISP that hosts GGC servers in Sherman, Texas and in Texarkana, Texas.

18.    Google caches content on these GGC servers located in this Judicial District.

19.    Google's GGC servers located in this Judicial District cache content that includes, among other things: (a) maps; (b) messages; and (c) digital content from the Google Play store.

20.    Google's GGC servers located in this Judicial District deliver cached content for the items in the preceding paragraph to residents in this Judicial District.

---

[10] *Uniloc 2017 LLC v. Google LLC*, Case No. 2:18-cv-00550, Dkt. 1 at 8 (E.D. Tex. 2018); https://peering.google.com/#/infrastructure

21.    Google generates revenue (a) by delivering video advertising; (b) from apps; and (c) from digital content in the Google Play store.

22.    Google treats its GGC servers in this Judicial District the same as it treats all of its other GGC servers in the United States.

23.    The photographs below show Google's GGC servers hosted by Suddenlink and the building where they are located at 322 North Glenwood Boulevard, Tyler, Texas 75702.


**Exterior**


**Interior Rack Spaces**


**Google GGC Servers**

24.    Google not only exercises exclusive control over the digital aspects of the GGC, but also exercises exclusive control over the physical server and the physical space within which the server is located and maintained.

25.    This Judicial District has previously determined that the GGC server itself and the place of the GGC server, both independently and together, meet the statutory requirement of a "physical place."[11]

26.    Likewise, this Judicial District has determined that GGC servers and their several locations within this Judicial District constitute "regular and established place[s] of business"

---

[11] *See Seven Networks, LLC v. Google LLC*, Case No. 2:17-cv-00442-JRG, Dkt. 235 at 24 (E.D. Tex. July 19, 2018).

within the meaning of the special patent venue statute.[12]

27.     Similarly, this Judicial District has determined that the GGC servers and their locations within the various ISPs within this Judicial District are "places of Google" sufficient to meet the statutory requirement of § 1400(b).[13]

*Google's Google Wi-Fi at Starbucks Locations in this Judicial District*

28.     On information and belief, Google provides Wi-Fi infrastructure and Wi-Fi service at Starbucks locations in this Judicial District. Google and Starbucks entered into an agreement in which Google provides its Google Wi-Fi or Google Fiber service at all Starbucks locations in this Judicial District, including at Starbucks stores and at Target stores.[14] First-time customers connect and use Google Wi-Fi on their devices in this Judicial District by selecting "Google Starbucks" from their respective device's list of available wireless networks and entering their respective name, email address, and postal code. Return customers are automatically connected to Google Wi-Fi on their respective devices at any Google Wi-Fi location. Upon connecting to the Google Wi-Fi locations in this Judicial District, Google provides connected customers with Internet access over Google's infrastructure and services.

---

[12] *See Seven Networks, LLC v. Google LLC*, Case No. 2:17-cv-00442-JRG, Dkt. 235 at 38 (E.D. Tex. July 19, 2018).
[13] *See Seven Networks, LLC v. Google LLC*, Case No. 2:17-cv-00442- JRG, Dkt. 235 at 41 (E.D. Tex. July 19, 2018).
[14] Locations for Starbucks stores can be found at https://www.starbucks.com/store-locator?map=32.467135,-95.387478,8z.



29.    Google uses its Google Wi-Fi infrastructure and Google Wi-Fi services at Starbucks locations in this Judicial District to provide customers with telecommunications services through its own phone carrier network, Google Fi. Google Fi is owned and operated by Google. In order to use Google Fi phone service in this Judicial District, Google provides its customers with special SIM cards and software to connect to and automatically switch between four sources of network infrastructure and services: T-Mobile, Sprint, US Cellular, and public Wi-Fi networks. As described below, Google has entered into agreements with T-Mobile, Sprint, and US Cellular to lease the carriers' infrastructure and services to provide Google Fi customers with voice and data services. As a fourth source, Google Fi uses public Wi-Fi networks, including the Google Wi-Fi at Starbucks locations in this Judicial District, to provide its phone carrier service. The Google Wi-Fi at Starbucks locations in this Judicial District are fixed geographical locations. They are "regular" and "established" because they operate in a "steady, uniform, orderly, and methodical manner" and are sufficiently permanent. They are "of the defendant" because Google has

---

[15] https://www.starbucks.com/store-locator?map=32.49512,-94.568225,11z&place=marshall%20tx

contractual and/or property rights to use the Google Wi-Fi locations to operate its businesses, including the Google Fi phone carrier business.

30.    Google determines whether a Google Fi customer in this Judicial District uses a certain Wi-Fi network, including the Google Wi-Fi networks at Starbucks locations, using the Google-provided SIM card and software on the customer's phone.

*Google's "Google Fi"*

31.    As described above, Google owns, operates, and provides telecommunications infrastructure and service in this Judicial District through its own phone carrier network, Google Fi. Google provides cellular and Wi-Fi infrastructure and services for phone, messaging, and data services in this Judicial District. Google provides its customers voice and high-speed data coverage (4G LTE) for cities such as Tyler, Longview, and Marshall, Texas.



32.    The cell towers used for Google's services are fixed geographical locations. They are "regular" and "established" because they operate in a "steady, uniform, orderly, and methodical manner" and are sufficiently permanent. They are "of the defendant" because Google has

---

[16] https://fi.google.com/coverage?q=marshall%20tx

contractual and/or property rights to use the cell towers to operate its business. Google also ratifies the service locations through its coverage lookup service.



33.    With this coverage lookup service, Google advertises its ability to provide cell coverage in this Judicial District and its selected cell towers in and near this Judicial District to provide the advertised coverage (*e.g.*, 2G, 3G, or 4G LTE) depending on the location in the Judicial District. *See* https://fi.google.com/about/coverage/. Google is not indifferent to the location of its cell towers. It "established" and "ratified" them where they are for a specific business purpose.

34.    Residents of this Judicial District also directly contract with and are billed by Google for these services.

---

[17] https://fi.google.com/about/coverage



<u>*Google Cloud Interconnect ("GCI") and Direct Peering*</u>

35.    Google additionally services its customers in this Judicial District (and other districts) through yet other facilities it has in this Judicial District. More specifically, Google's equipment is located in this Judicial District in Denton County, Texas, at two facilities referred to as "Megaport." At the Megaport facilities in this Judicial District, Google offers two services: Google Cloud Interconnect ("GCI") and Direct Peering.

36.    GCI is a service from Google that allows customers to connect to Google's Cloud Platform directly, as opposed to, for example, over the public network.

---

[18] https://fi.google.com/about/plan



Interconnect > Documentation

## Partner Interconnect Overview

SEND FEEDBACK

Google Cloud Interconnect - Partner (Partner Interconnect) provides connectivity between your on-premises network and your VPC network through a supported service provider. A Partner Interconnect connection is useful if your data center is in a physical location that can't reach a Dedicated Interconnect colocation facility or if your data needs don't warrant an entire 10 Gbps connection.

### Before you use Partner Interconnect



> ★ **Note:** Partner Interconnect requires that you separately obtain services from a third-party network service provider. Google is not responsible for any aspects of Partner Interconnect provided by the third-party service provider nor any issues outside of Google's network.

- You must be familiar with the Cloud Interconnect terminology described in Key Terminology.
- You must work with a supported service provider to establish connectivity between their network and your on-premises network.

### How does Partner Interconnect work?

Service providers have existing physical connections to Google's network that they make available for their customers to use.

After you establish connectivity with a service provider, you can request a Partner Interconnect connection from your service provider. After the service provider provisions your connection, you can start passing traffic between your networks by using the service provider's network.

The following diagram provides a high-level overview of a customer using a service provider to connect to Google:



Basic Partner Interconnect topology (click to enlarge)

[19]

37.    Google's Direct Peering services allow its customers to exchange Internet traffic between its customers' networks and Google's at one of its broad-reaching Edge network locations, such as the one at Megaport.

---

[19] https://cloud.google.com/interconnect/docs/concepts/partner-overview

Interconnect > Documentation > Google Cloud

# Direct Peering



SEND FEEDBACK

Direct Peering allows you to establish a direct peering connection between your business network and Google's edge network and exchange high-throughput cloud traffic. This capability is available at any of more than 100 locations in 33 countries around the world. Visit Google's peering site to find out more information about Google's edge locations.

When established, Direct Peering provides a direct path from your on-premises network to Google services, including the full suite of Google Cloud Platform products. Traffic from Google's network to your on-premises network also takes that direct path, including traffic from VPC networks in your projects. GCP customers must request direct egress pricing be enabled for each of their projects after they have established direct peering with Google. Refer to pricing for details.

## Considerations

If used with GCP, Direct Peering doesn't produce any custom routes in a VPC network. Traffic sent from resources in a VPC network leaves by way of a route whose next hop is either a *default Internet gateway* (a default route, for example) or a Cloud VPN tunnel. If the destination for the traffic matches your on-premises IP ranges, it could be eligible for discounted egress rates, as described below.

To send traffic through Direct Peering using a route whose next hop is a Cloud VPN tunnel, the IP address of your on-premises network's VPN gateway must be in your configured destination range.

Direct Peering exists outside of Google Cloud Platform. Instead of Direct Peering, the recommended methods of access to GCP are Cloud Interconnect – Dedicated or Cloud Interconnect – Partner.

See the next section to determine which of these solutions is right for you.

20

38.     In establishing such a direct connection, Google provides the necessary physical equipment at Megaport to enable GCI or Direct Peering connections. At least the Megaport facility shown below is located in this Judicial District and is advertised by Google as a GCI facility.

---

[20] https://cloud.google.com/interconnect/docs/how-to/direct-peering

| Dallas | Alestra ☑ | Layer 2 and 3 |
| | Arelion ☑ | Layer 2 and 3 |
| | C3NTRO ☑ | Layer 2 and 3 |
| | Console Connect by PCCW Global ☑ | Layer 2 and 3 |
| | Cox ☑ | Layer 2 and 3 |
| | DE-CIX ☑ | Layer 2 and 3 |
| | Equinix ☑ | Layer 2 and 3 |
| | InterCloud ☑ | Layer 2 and 3 |
| | Internet2 ☑ | Layer 2 and 3 |
| | Lumen ☑ | Layer 2 and 3 |
| | MCM Telecom ☑ | Layer 2 and 3 |
| | Megaport ☑ | Layer 2 and 3 |
| | PacketFabric ☑ | Layer 2 and 3 |
| | Transtelco ☑ | Layer 2 and 3 |

[21]

39.     Clicking on the Megaport link from the screenshot of Google's website in the preceding paragraph directs a customer to the details for directly connecting to Google's equipment at the facility in this Judicial District to connect to Google's GCI service.

---

[21] https://cloud.google.com/network-connectivity/docs/interconnect/concepts/service-providers#north-america



40.     More particularly, the Google-linked Megaport site explains how a Google customer can use the Google Cloud Platform console to enable connection to the Google equipment at the Megaport facility in this Judicial District.

---

[22] https://www.megaport.com/services/google-cloud-partner-interconnect/



41.    Both Google's website and Megaport's website advertise the peering service and point a consumer to the website, www.peeringdb.com, for details. The peering DB website lists Megaport Dallas as a Google peering facility.

---

[23] https://docs.megaport.com/cloud/megaport/google/

## Who can peer with Google?

Google recommends Google Cloud customers to use a Verified Peering Provider instead of Direct Peering.

Connecting with a Verified Peering Provider lets Google customers reach all publicly available Google resources without the complexity of managing Direct Peering connectivity to Google.

Google Cloud customers that choose a Verified Peering Provider do not need to meet Google's Direct Peering requirements and can work directly with a Verified Peering Provider to acquire internet services that provide access to Google.

To view a list of available Verified Peering Providers, see their connectivity to Google, learn about their services, and find providers in different areas, see the Google Edge Network.

Google recommends Google Cloud customers who do not use a Verified Peering Provider to privately peer with Google. Private peering provides dedicated physical ports between Google and customers, and can provide better performance and reliability than public peering.

When privately peering, Google requires physical redundancy with at least two separate connections to Google in a single metropolitan area. Each physical connection must have its own IP addressing.

Any Google Cloud customers that meet Google's technical peering requirements can be considered for Direct Peering. Google can peer at locations listed in our PeeringDB entry.

For more information about requirements, and to review Google's peering best practices for Google Cloud customers, visit Google peering.

24

Megaport - Google IX Peering Locations:

- MegaIX: Ashburn, Dallas, Los Angeles, Seattle, Singapore, Sofia, Sydney
- AMS-IX: Chicago, New York, Bay Area

See PeeringDB for additional details.

25

---

24 https://cloud.google.com/interconnect/docs/how-to/direct-peering
25 https://knowledgebase.megaport.com/cloud-connectivity/google-cloud-platform-direct-peering/



42. Megaport's website also confirms, in its "Looking Glass" tool, the presence of Google at its facility (AS No. 15169).



26 https://www.peeringdb.com/net/433
27 https://lg.megaport.com/

43.     Both of Megaport's "Dallas" locations are in the Eastern District of Texas in Denton County.[28] The larger Megaport facility, the Carrollton facility, is located at 1649 West Frankford Road and is the largest of its kind in the State of Texas.[29] The smaller Megaport facility, the Lewisville facility, is located at 2501 S. State Highway 121.[30]

44.     The Google equipment at Megaport's facilities, which provides the GCI and Direct Peering services for Google customers, are fixed geographical locations. They are "regular" and "established" because they operate in a "steady, uniform, orderly, and methodical manner" and are sufficiently permanent. They are "of the defendant" because Google holds contractual and/or property rights to use this space and to maintain this equipment. Google also ratifies the equipment through advertising of the Megaport locations as authorized to provide these Google services.

*Other Google Presence in this Judicial District*

45.     In addition to the Google presence described above, Google has other pervasive contracts in this Judicial District.

46.     Google has multiple authorized repair centers in the Eastern District of Texas. A resident can visit Google's website to find a list of these repair centers:

---

[28] https://www.megaport.com/megaport-enabled-locations/?locationId=102
[29] *Id.*
[30] *Id.*

## Find a repair partner

Use the table below to find available repair partners in your region. If there isn't an option available for your region, contact us.

Choose your country: [United States ▾]

| Region | Provider | Devices | Type of service | Repair type | Contact |
|--------|----------|---------|-----------------|-------------|---------|
| United States | Google | All Pixel phones | Mail-in and walk-in | In-warranty and out-of-warranty | Google 🔗 * |
| | | Pixel Tablet | Mail-in | Out-of-warranty | Google 🔗 |
| | Asurion or uBreakiFix | All Pixel phones | Mail-in and walk-in | Out-of-warranty | **Phone**: +1 877-320-2237 Asurion or uBreakiFix 🔗 |
| | | Pixel 6 and later, including Fold | Mail-in and walk-in | In-warranty and out-of-warranty | |

*For the most up-to-date partner locations and options for your specific device or damage, refer to Google 🔗 .

In US and Canada, replacement of parts or product service is made available for a minimum of 3 years after end of production for all Pixel devices through Google or its service providers. [31]

47.    Google's only authorized walk-in repair center, uBreakiFix by Asurion, lists at least four facilities in this Judicial District:

---

[31] https://support.google.com/store/answer/7182296?hl=en





32



33

48.    Google and uBreakiFix teamed up to offer free repairs to those impacted by Hurricane Florence.

49.    uBreakiFix has fixed geographical locations. They are "regular" and "established" because they operate in a "steady, uniform, orderly, and methodical manner" and are sufficiently

---

32 https://www.ubreakifix.com/google-repair/google-pixel-repair
33 https://www.asurion.com/repairs/tech/locations/tyler/

permanent. These stores are "of the defendant" because Google has contractual rights with uBreakiFix—the only authorized walk-in repair centers in the United States. Google also ratifies these facilities through its advertising of them through its website.

50.    Google also has branded, mail-in repair service that is contracted with a company called KMT Wireless, LLC, d/b/a Cynergy Hitech. Cynergy Hitech receives phones at its facility in Grapevine, Texas.

## Find a repair partner

Use the table below to find available repair partners in your region. If there isn't an option available for your region, contact us.

Choose your country:    United States ▾

| Region | Provider | Devices | Type of service | Repair type | Contact |
|---|---|---|---|---|---|
| United States | Google | All Pixel phones | Mail-in and walk-in | In-warranty and out-of-warranty | Google ☒ * |
| | | Pixel Tablet | Mail-in | Out-of-warranty | Google ☒ |
| | Asurion or uBreakiFix | All Pixel phones | Mail-in and walk-in | Out-of-warranty | **Phone**: +1 877-320-2237<br>Asurion or uBreakiFix ☒ |
| | | Pixel 6 and later, including Fold | Mail-in and walk-in | In-warranty and out-of-warranty | |

*For the most up-to-date partner locations and options for your specific device or damage, refer to Google ☒ .

In US and Canada, replacement of parts or product service is made available for a minimum of 3 years after end of production for all Pixel devices through Google or its service providers.

[34]

51.    Google has operated and is currently operating its Google Maps Street View business and services in this Judicial District. For example, the image below shows the Google Maps Street View of the Eastern District of Texas courthouse in Marshall.

---

[34] https://support.google.com/store/answer/7182296?hl=en



Furthermore, in the lower right-hand corner of the Google Street View above, the image is credited to Google and states that it was captured in October 2023.



52.    Google also operates a Street View car in and around this Judicial District in order to provide the Google Maps Street View service.[36]

53.    In addition to the above Google Street View image, Google operates and continues to operate a fleet of Google Street View vehicles in this Judicial District, including in the counties of Houston, Trinity, Polk, Angelina, Anderson, VanZandt, Denton, and Collin, as shown below.

---

[35] https://www.google.com/maps/@32.5447184,-94.3668888,3a,75y,211.78h,88.91t/data=
!3m6!1e1!3m4!1s1iGIaeAXPTpQQ3PT48kX1Q!2e0!7i16384!8i8192?entry=ttu
[36] *See* https://www.google.com/streetview/explore/

54.     Google provides its Google Express business and services to the residents of this Judicial District by advertising and inviting the residents of this Judicial District, then Defendant arranges for a delivery company to bring the goods and products purchased through the Google Express website to the residents of this Judicial District.[38] This service uses fixed geographical stores in this Judicial District. They are "regular" and "established" because they operate in a "steady, uniform, orderly, and methodical manner" and are sufficiently permanent. They are "of the defendant" because Google ratifies the stores (and selects products of the stores) through its website. Only information provided by Google through its service can be purchased, although the store may have other items for sale.

55.     Google previously leased office space in this Judicial District for about fifty (50) people through its Frisco, Texas office.

56.     Google also provides services to businesses and schools in this Judicial District, including email services, word processing software, electronic file storage services, and video conferencing services. Google brands such services as "G Suite" services. Non-limiting examples of such businesses and schools include the Frisco Independent School District, as shown below.[39]

---

[37] https://www.google.com/streetview/explore/
[38] *See* https://support.google.com/express/answer/4561693?hl=en.
[39] http://schools.friscoisd.org/hs/lebanontrail/site/resources/google-apps-information

# Google Classroom

Google Classroom is a web-based platform that integrates students' G Suite for Education accounts with Google Docs. Google Classroom saves time and paper and allows teachers to create classes, distribute assignments and communicate.

Google Classroom is already available on Frisco ISD devices. If students are accessing via a family-owned device, it may be helpful to download the app: iOS devices /Android devices.

**Google Classroom Resources**

- **What is Google Classroom and How to Use It?**
- **Parents' Video Guide to Google Classroom**
- **Student Quick Google Classroom Reference**
- **Additional Google Classroom Resources**

**Google Classroom Access & Log in:**
- **At Home**
- **Via the Student Portal**

[40]

57.    Google also provides advertising services to businesses in this Judicial District, including soliciting reviews of patrons that have visited a business in the Eastern District of Texas, as shown below.

---

[40] https://www.friscoisd.org/departments/technology-and-media-services/technology-tools-support#q5



58.     Google also monitors traffic conditions in this Judicial District. For example, traffic conditions between a McDonalds and the Federal Courthouse in Marshall, as shown below.



59.     Separate and apart from its Google Fi mobile service, Google also provides telephone services to residents in this Judicial District through a product it calls Google Voice.[43]

---

[41] Product Testing at https://www.google.com/maps
[42] Product Testing at https://www.google.com/maps
[43] https://voice.google.com/u/0/signup



60.    Google provides Software-as-a-Service applications, including email and server space, to Texas public universities. Non-limiting examples of such universities are Texas A&M University (which has facilities in this Judicial District) and Texas A&M Commerce (located in this Judicial District), as shown below.



---

[44] https://voice.google.com/u/0/signup
[45] http://google.tamu.edu/

```
Welcome Lions to your new LeoMail 2.0 found in your myLEO homepage located
at myLEO.tamu-commerce.edu.
We hope you take some time to look through your new student email. As a
reminder the new email is a gmail platform and share many features that a
regular gmail account has.

In addition to email, you will have the ability to build your own contacts
list and use the built in calendar for planning and organizing.
The most asked question has revolved around the ability to sync this email
account with your mobile or smart phone device. The answer is ³yes². The
Portal Implementation Team is working on getting both the email and your NEW
myLEO account connected in an application that will be available in June.
```
[46]

_Other Google Presence in the State_

61.     Google also has a pervasive connection to the State of Texas through multiple

commercial activities.

62.     Google has purchased land in Midlothian, Texas where it is currently constructing

a $600 million data center.[47]

63.     Since 2007, Google has employed "hundreds" of employees in Texas, including in

Austin, Texas.[48]

64.     Google has at least one current office located in Austin, on North MoPac

Expressway,[49] and additional office locations at University Park and Austin Children's Museum.[50]

65.     Google has leased over 200,000 square feet of office space in Austin, Texas, located

at 500 West 2nd Street.[51]

---

[46] http://mailman.tamuc.edu/pipermail/students/2012-May/004325.html

[47] _See_ https://www.dallasnews.com/business/real-estate/2019/06/14/google-s-massive-600m-data-center-takes-shape-in-ellis-county-as-tech-giant-ups-texas-presence/

[48] According to Gerardo Interiano, Google's public affairs and government relations manager, in a statement. _See_ http://www.statesman.com/business/google-lease-200-000-square-feet-newdowntown-austin-tower/SANZSa3du8QQ4k8ytOC2rJ/

[49] _See_ https://www.google.com/intl/en/about/locations/?region=north-america.

[50] _See_ http://www.statesman.com/business/google-lease-200-000-square-feet-new-downtownaustin-tower/SANZSa3du8QQ4k8ytOC2rJ/

[51] _See_ http://www.statesman.com/business/google-lease-200-000-square-feet-new-downtownaustin-tower/SANZSa3du8QQ4k8ytOC2rJ/

66.     Google has, as of May 2024, job postings for Austin, Texas; Red Oak, Texas; Addison, Texas; Dallas, Texas; Houston, Texas; Midlothian, Texas; and Austonio, Texas (129 postings) including positions such as:

- Power Monitoring Execution Engineer, Google Data Center (Midlothian, TX)

- Network Implementation Engineer, Global Network Delivery (Addison, TX)

- Senior Finance Manager, Data Center Equipment (Austin, TX)

- Data Center Operations Facility Technician, Generators (Red Oak, TX)

- Field Solutions Developer II, Generative AI, Google Cloud (Houston, TX)

- Chrome Enterprise Premium Specialist (Austonio, TX)

67.     Upon information and belief, Defendant has at least eleven (11) entities registered in Texas, including:

- GOOGLE LLC

- GOOGLE ACQUISITION HOLDING, INC.

- GOOGLE COMPARE AUTO INSURANCE SERVICES INC.

- GOOGLE COMPARE CREDIT CARDS INC.

- GOOGLE COMPARE MORTGAGES INC.

- GOOGLE FIBER INC.

- GOOGLE FIBER NORTH AMERICA INC.

- GOOGLE FIBER TEXAS, LLC

- GOOGLE INC.

- GOOGLE NORTH AMERICA INC.

- GOOGLE PAYMENT CORP.

68.     Google has provided, currently provides, and is currently offering to provide its Google Fiber services to the residents of Austin, Texas, and San Antonio, Texas.[52]

69.     Google has invested $200,000,000 in the Spinning Spur Wind Farm Project in Oldham County, Texas.[53]

70.     Google acquired Waze in 2013,[54] and Google's Waze traffic app partners with cities and businesses in Texas, non-limiting examples of which include the Waze partnership with the City of Fort Worth to provide constant traffic data to the city.[55] Another non-limiting example includes the Waze partnership with the Genesis Group in Tyler to decrease emergency response times.[56]

71.     This Court has previously found that Google maintains a regular and established place of business in this Judicial District. *AGIS Software Dev. LLC v. Google LLC*, Case No. 2:19-CV-00361-JRG, Dkt. 378.

## PATENTS-IN-SUIT

72.     On December 8, 2009, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 7,631,192 (the "'192 Patent") entitled "Network Apparatus for Accessing Services Over a Network." A true and correct copy of the '192 Patent is attached as Exhibit A.

73.     On December 9, 2014, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 8,908,106 (the "'106 Patent") entitled "Mobile Terminal." A true

---

[52] *See* https://fiber.google.com/cities/austin/ and https://fiber.google.com/cities/sanantonio/
[53] *See* https://venturebeat.com/business/googles-tosses-200m-at-spinning-spur-wind-project-to-bring-its-green-power-to-2-gigawatts/
[54] *See* https://techcrunch.com/2013/06/11/its-official-google-buys-waze-giving-a-social-data-boost-to-its-location-and-mapping-business/
[55] *See* https://dallasinnovates.com/fort-worth-waze-partner-ease-traffic-woes/
[56] *See* https://genesisworld.com/the-genesis-group-joins-waze-connected-citizens-program/

and correct copy of the '106 Patent is attached as Exhibit B.

74.    On November 8, 2011, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 8,055,187 (the "'187 Patent") entitled "Communication Terminal and Communication Method for Exchanging Contents." A true and correct copy of the '187 Patent is attached as Exhibit C.

75.    On June 28, 2022, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 11,375,254 (the "'254 Patent") entitled "Control Apparatus." A true and correct copy of the '254 Patent is attached as Exhibit D.

76.    On January 1, 2019, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 10,171,847 (the "'847 Patent") entitled "Information Device and Distribution Device." A true and correct copy of the '847 Patent is attached as Exhibit E.

77.    FEC is the sole and exclusive owner of all right, title, and interest to and in the '192, 106, '187, '254, and '847 Patents (collectively, the "Patents-in-Suit"), and holds the exclusive right to take all actions necessary to enforce its rights to the Patents-in-Suit, including the filing of this patent infringement lawsuit. FEC also has the right to recover all damages for past infringement of the Patents-in-Suit as appropriate under the law.

78.    FEC has at all times complied with the marking provisions of 35 U.S.C. § 287 with respect to the Patents-in-Suit.

## FACTUAL ALLEGATIONS

79.    The Patents-in-Suit generally cover systems and methods for video streaming and content sharing by associating multiple electronic devices.

80.    The '192 Patent generally relates to a network apparatus and method for controlling visual display data on one electronic device with a display through another electronic device with

a display. For example, a remote controller device sends its own ID code when specifying an access destination to a main device, and upon receipt of an access command from the remote controller device, the main device appends the ID code of the remote controller device to information obtained by accessing the access destination and outputs the same. The remote controller device takes in the output only when it is appended with its own ID code and displays the same on a display unit. Thus, the user can confirm the information the main device has obtained from the network on the display unit of the remote controller device. Consequently, the risk that the information is seen by anyone around can be reduced, thereby making it possible to improve the security on the private information. The inventions described in the '192 Patent were developed by Masahiro Matsuo.

81.    The '106 Patent generally relates to a mobile terminal for turning on an external device upon opening a digital application on the mobile terminal. For example, a mobile device stores a TV application for serving as a remote control capable of controlling a TV receiver. The mobile device starts the process of starting the TV application and transmits, to the TV receiver, control signals to turn on the TV receiver before the TV application has been started. More particularly, the mobile device transmits the control signals to turn on the TV receiver while performing the process of starting the TV application. When the mobile device has started the TV application and then the TV receiver has been turned on in normal mode, a user can control the TV receiver by using the mobile device. The inventions described in the '106 Patent were developed by Masaki Mori.

82.    The '187 Patent generally relates to a communication terminal and method for exchanging and duplicating digital contents between devices. For example, a content reproducing device is used in a contents exchange system including a plurality of content reproducing devices.

The content reproducing device includes a short range communication unit, a memory, a control unit, and a speaker. The short range communication unit communicates request information, response information, content data and flag information to/from content reproducing devices. The control unit controls the short range communication unit so that content data is transmitted. The control unit controls the memory such that the content data and the flag information received by the short range communication unit are stored. The inventions described in the '187 Patent were developed by Hideki Tanabe.

83.     The '254 Patent generally relates to a control apparatus for segmentation of data files and playback functionality for segments of video data files. For example, a control apparatus is connected to a server device storing content and to a playback device, and controls playback of the content at the playback device. The control apparatus includes a receiver that receives the content from the server device, and a controller that transmits to the playback device information about a first playback position in the content received by the receiver. The inventions described in the '254 Patent were developed by Makoto Takemoto, Makoto Imagawa, Shinichi Toge, Kanji Imanishi, and Masatoshi Miyoshi.

84.     The '847 Patent generally relates to an information device for downloading video data through sequentially downloaded divided video data files. For example, an information device is provided that includes a communication component and a controller. The communication component communicates with an external device. The controller downloads video data from the external device through the communication component. The controller performs processing for playing the video data. The controller executes an application for playing the downloaded video data. The controller sends a download request for each divided video data, with the divided video data being obtained by dividing up the video data. The inventions described in the '847 Patent

were developed by Yoshinobu Imoto, Yoshikazu Fujita, Eiji Nakata, Ryuji Ikeda, Masahito Teraoka, Kanji Imanishi, Makoto Takemoto, Makoto Imagawa, Shinichi Toge, and Masatoshi Miyoshi.

85.     Defendant has infringed and continues to infringe the Patents-in-Suit by making, using, selling, offering to sell, and/or importing, and by actively inducing others to make, use, sell, offer to sell, and/or import products, including mobile phones, tablets, smart watches, Google Streamers, the Google Cast app, the Google Home app, the Google TV app, the Google Meet app, and the YouTube TV app that implement the technology claimed by the Patents-in-Suit.

86.     Defendant has had actual notice of the Asserted Patents, at least as of the filing date of this Complaint.

87.     FEC has, at all times, complied with the marking provisions of 35 U.S.C. § 287 with respect to the Asserted Patents.

## COUNT I
### (Infringement of the '192 Patent)

88.     Paragraphs 1 through 87 are incorporated by reference as if fully set forth herein.

89.     FEC has not licensed or otherwise authorized Defendant to make, use, offer for sale, sell, or import any products that embody the inventions of the '192 Patent.

90.     Defendant has and continues to directly infringe the claims of the '192 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, at least by making, using, offering to sell, selling, and/or importing into the United States products, such as the Accused Products, that satisfy each and every limitation of one or more claims of the '192 Patent, and by performing each and every step of one or more method claims of the '192 Patent.

91.    The Accused Products each perform the method of at least claim 17 of the '192 Patent: A method for accessing information over a network, comprising: sending a request for information from a portable remote controller device having a first display to a main device configured to be connected to a second display; obtaining the requested information from the network; providing the obtained information from the main device to the remote controller device; displaying the sent information on the first display of the remote controller device; sending a display switching signal from the remote controller device to the main device; and determining whether the second display of the main device displays the obtained information based on the display switching signal sent from the remote controller device.

92.    The Accused Products perform a method for accessing information over a network, comprising: sending a request for information from a portable remote controller device having a first display to a main device configured to be connected to a second display. For example, the Google Pixel 10 performs a method for accessing information (e.g., streaming data) over a network (e.g., GGC, Wi-Fi, Internet, and/or Bluetooth) by sending a request for information (e.g., a request for online content, connection information, passcode prompts, channel information, video data and/or audio data) as a portable remote controller device having a first display (e.g., touch display screen on the Google Pixel 10) to a main device (e.g., Google TV Streamer) configured to be connected to a second display (e.g., a smart television).

## Use your phone as the remote for your Chromecast or Google TV Streamer

You can use the Google Home app or Google TV app on your phone to control your Google streaming device. [57]

Both Chromecast with Google TV (HD) and Chromecast with Google TV (4K) work with any TV that has an HDMI connection, even if the TV has a different resolution than the Chromecast. [58]

## Background

First, it's important to understand how Chromecasts work in a broad sense. A Chromecast is basically a glorified web browser, capable of loading web pages and displaying them full-screen on a TV. When you press the "Cast" button on your phone or computer, that device (the *sender*) uses a proprietary network protocol called CastV2 to connect to your Chromecast (the *receiver*) and send it the URL to load, along with extra information like what account to use and what video to play. The Chromecast then loads that URL and streams the media entirely on its own. [59]

---

[57] https://support.google.com/chromecast/answer/11221499

[58] https://support.google.com/chromecast/answer/12578818?hl=en&ref_topic=10089023

[59] https://www.reddit.com/r/Chromecast/comments/1j8wtxa/heres_why_a_fix_is_taking_so_long/



93.    The Accused Products perform obtaining the requested information from the network. For example, the Google Chromecast obtains requested information (e.g., online content, connection information, passcode prompts, channel information, video data, and/or audio data) from the network (e.g., GGC, Wi-Fi, internet, and/or Bluetooth).

---

[60] https://www.youtube.com/watch?v=AMWZTXBCd1s

> **Background**
>
> First, it's important to understand how Chromecasts work in a broad sense. A Chromecast is basically a glorified web browser, capable of loading web pages and displaying them full-screen on a TV. When you press the "Cast" button on your phone or computer, that device (the *sender*) uses a proprietary network protocol called CastV2 to connect to your Chromecast (the *receiver*) and send it the URL to load, along with extra information like what account to use and what video to play. The Chromecast then loads that URL and streams the media entirely on its own. [61]

> attached larger screen. The tablet device becomes a remote control. In this setting, the control packets such as play, stop, pause, etc. are sent through clear-text over HTTP from tablets to YouTube servers. The video control packets are sent from the mobile remote device to YouTube servers and video is streamed directly to the Chromecast. When looked closer to the control packets; they use HTTP POST, HTTP GET methods to control the video played on Chromecast attached screen. [62]

94.    The Accused Products perform providing the obtained information from the main device to the remote controller device and displaying the sent information on the first display of the remote controller device. For example, the Google Pixel 10 receives the information from the main device (e.g., Google Streamer) and displays the sent information on the first display of the remote controller device (e.g., touch display screen on the Google Pixel 10), *e.g.* via switching stream or screen mirroring.

> Google Cast sender applications control the playback on the receiver device by sending messages in JSON format to the receiver application. Likewise, the receiver sends messages back to the sender, also in JSON. The messages may be commands from the sender that change the player state, responses to those commands from the receiver, or data structures that describe the media for the receiver application. [63]

---

[61] https://www.reddit.com/r/Chromecast/comments/1j8wtxa/heres_why_a_fix_is_taking_so_long/

[62] https://imdeepika.medium.com/magic-of-chromecast-under-the-hood-f7418d895bd3

[63] https://developers.google.com/cast/docs/media/messages



95.    The Accused Products perform sending a display switching signal from the remote controller device to the main device. For example, the Google Pixel 10 sends a display switching signal (e.g., to stream to the main device and/or mirror a display on the main device) from the remote controller device (e.g., the Google Pixel 10) to the main device (e.g., Google Streamer).

---

[64] https://www.youtube.com/watch?v=AMWZTXBCd1s

YouTube app in Android tablet has a cast to Chromecast button enabled if the mobile device has previously discovered a Chromecast device in the same network. Once tapped, the tablet would stop showing the video on the small screen and start streaming the YouTube video to the Chromecast attached larger screen. The tablet device becomes a remote control. In this [65]

## Cast videos on your TV with a phone or tablet

1. Connect your device and your Chromecast or TV to the same wireless network.
2. On your phone or tablet, open the Google TV app 🔲.
3. Near the bottom right, tap {#} TVs nearby.
4. Select the video or TV show you want to watch.
5. Tap **Watch on TV**. [66]

96.    The Accused Products perform determining whether the second display of the main device displays the obtained information based on the display switching signal sent from the remote controller device. For example, the Google Pixel 10 determines whether the second display (e.g., smart television) connected to the main device (e.g., Google Streamer) displays obtained information (e.g., online content, connection information, passcode prompts, channel information, video files, etc.) based on the display switching signal sent from the remote controller device (e.g., the Google Pixel 10).

---

[65] https://imdeepika.medium.com/magic-of-chromecast-under-the-hood-f7418d895bd3
[66] https://support.google.com/googletv/answer/11136134

YouTube app in Android tablet has a cast to Chromecast button enabled if the mobile device has previously discovered a Chromecast device in the same network. Once tapped, the tablet would stop showing the video on the small screen and start streaming the YouTube video to the Chromecast attached larger screen. The tablet device becomes a remote control. In this [67]

## Background

First, it's important to understand how Chromecasts work in a broad sense. A Chromecast is basically a glorified web browser, capable of loading web pages and displaying them full-screen on a TV. When you press the "Cast" button on your phone or computer, that device (the *sender*) uses a proprietary network protocol called CastV2 to connect to your Chromecast (the *receiver*) and send it the URL to load, along with extra information like what account to use and what video to play. The Chromecast then loads that URL and streams the media entirely on its own. [68]



97.    Defendant has and continues to indirectly infringe one or more claims of the

'192 Patent by inducing infringement by others, such as Defendant's customers and end-users, in

---

[67] https://imdeepika.medium.com/magic-of-chromecast-under-the-hood-f7418d895bd3
[68] https://www.reddit.com/r/Chromecast/comments/1j8wtxa/heres_why_a_fix_is_taking_so_long/
[69] https://www.youtube.com/watch?v=AMWZTXBCd1s

this District and elsewhere in the United States. For example, Defendant's customers and end-users directly infringe, either literally or under the doctrine of equivalents, through their use of the inventions claimed in the '192 Patent. Defendant induces this direct infringement through its affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the Accused Products, and providing instructions, documentation, and other information to customers and end-users suggesting that they use the Accused Products in an infringing manner, including technical support, marketing, product manuals, advertisements, and online documentation.[70]

98.    Because of Defendant's inducement, Defendant's customers and end-users use the Accused Products in a way Defendant intends and they directly infringe the '192 Patent. Defendant performs these affirmative acts with knowledge of the '192 Patent and with the intent, or willful blindness, that the induced acts directly infringe the '192 Patent.

99.    Defendant has indirectly infringed and continues to indirectly infringe one or more claims of the '192 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such as customers and end-users, in this District and elsewhere in the United States. Defendant's affirmative acts of selling and offering to sell the '192 Accused Products in this District and elsewhere in the United States and causing the '192 Accused Products to be manufactured, used, sold, and offered for sale contribute to others' use and manufacture of the Accused Products, such that the '192 Patent is directly infringed by others. The accused components within the Accused Products including, but not limited to, software manufactured by Defendant, are material to the invention of the '192 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by Defendant to be especially made or adapted for use in the infringement of the '192 Patent. Defendant performs

---

[70] *See, e.g.*, https://support.google.com/chromecast/?hl=en

these affirmative acts with knowledge of the '192 Patent and with intent, or willful blindness, that they cause the direct infringement of the '192 Patent.

100.    Because of Defendant's direct and indirect infringement of the '192 Patent, FEC has suffered damages in an amount to be proven at trial.

**COUNT II**
**(Infringement of the '106 Patent)**

101.    Paragraphs 1 through 87 are incorporated by reference as if fully set forth herein. FEC has not licensed or otherwise authorized Defendant to make, use, offer for sale, sell, or import any products that embody the inventions of the '106 Patent.

102.    Defendant has and continues to directly infringe the claims of the '106 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, at least by making, using, offering to sell, selling, and/or importing into the United States products and actively inducing others to make, use, sell, offer to sell, and/or import products, such as the Accused Products, that satisfy each and every limitation of one or more claims of the '106 Patent, and by performing each and every limitation of one or more method claims of the '106 Patent.

103.    The Accused Products each comprise the apparatus of at least claim 1 of the '106 Patent: A mobile terminal comprising: a signal transmission unit which transmits control signals to an external device; an operation unit for a user to perform various actions; and a microprocessor that starts a control application for control of the external device, and transmits, to the external device, an operation control signal based on remote control function of the control application, in response to a user action on the operation unit by using the signal transmission unit, wherein when starting the control application, the microprocessor transmits, to the external device, a turning-on control signal to turn on the external device by using the signal transmission unit before the process of starting the control application is completed.

104.    The Accused Products comprise a mobile terminal comprising a signal transmission unit which transmits control signals to an external device. For example, the Google Pixel 10 comprises a signal transmission unit (e.g., Wi-fi transceiver, Bluetooth transceiver, etc.) which transmits control signals (e.g., play, pause, volume up/down, power on/off, select, etc.) to an external device (e.g., Google Streamer, Chromecast, smart television, etc.).



---

[71] https://www.theverge.com/2023/5/10/23717404/google-home-app-release-date-features-matter-io

[72] https://store.google.com/product/pixel_10_specs?hl=en-US

105.    The Accused Products comprise an operation unit for a user to perform various actions. For example, the Google Pixel 10 comprises an operation unit (e.g., touch screen, volume buttons, etc.) for a user to perform various actions (e.g., swipe or select digital switch, button, or option).



73

---

73 https://www.theverge.com/2023/5/10/23717404/google-home-app-release-date-features-matter-io



**Control Your Google TV with your Phone** [74]

  106. The Accused Products comprise a microprocessor that starts a control application for control of the external device, and transmits, to the external device, an operation control signal based on remote control function of the control application, in response to a user action on the operation unit by using the signal transmission unit. For example, the Google Pixel 10 comprises a microprocessor (e.g., Google Tensor G5) that starts a control application (e.g., Google TV, Google Home) for control of the external device (e.g., Google Streamer, Chromecast, smart television, etc.), an operation control signal based on remote control function of the control application (e.g., a Wi-Fi signal to show display, change channel, make selection, etc.), in response to a user action on the operation unit (e.g., the user tapping or sliding across the touch screen) by using the signal transmission unit.

---

[74] https://www.youtube.com/watch?v=dx_tmaoyg8E at 0:33



75

---

75 https://www.theverge.com/2023/5/10/23717404/google-home-app-release-date-features-matter-io



107.    The Accused Products comprise a mobile terminal wherein when starting the control application, the microprocessor transmits, to the external device, a turning-on control signal to turn on the external device by using the signal transmission unit before the process of starting the control application is completed. For example, on information and belief, when a user begins the startup process of the control application (e.g., Google TV, Google Home), the Google Pixel 10 transmits to the external device (e.g., Google Streamer, Chromecast, smart television, etc.) a turning-on control signal (e.g., a screensaver wake signal) to activate and turn on the external device before the process of starting the control application is completed.

---

[76] https://www.youtube.com/watch?v=dx_tmaoyg8E at 0:33

## Ambient screensaver for Chromecast and Google TV Streamer

When your Google streaming device isn't being used, it can quietly keep you entertained with the ambient screensaver. You must be signed into your Google Account to set up and configure the ambient screensaver.[77]

108.    Defendant has and continues to indirectly infringe one or more claims of the '106 Patent by inducing infringement by others, such as Defendant's customers and end-users, in this District and elsewhere in the United States. For example, Defendant's customers and end-users directly infringe, either literally or under the doctrine of equivalents, through their use of the inventions claimed in the '106 Patent. Defendant induces this direct infringement through its affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the Accused Products, and providing instructions, documentation, and other information to customers and end-users suggesting that they use the Accused Products in an infringing manner, including technical support, marketing, product manuals, advertisements, and online documentation.[78]

109.    Because of Defendant's inducement, Defendant's customers and end-users use the Accused Products in a way Defendant intended and they directly infringe the '106 Patent. Defendant performs these affirmative acts with knowledge of the '106 Patent and with the intent, or willful blindness, that the induced acts directly infringe the '106 Patent.

110.    Defendant has indirectly infringed and continues to indirectly infringe one or more claims of the '106 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such as customers and end-users, in this District and elsewhere in the United States. Defendant's affirmative acts of selling and offering to sell the '106 Accused Products in this

---

[77] https://support.google.com/chromecast/answer/6080931?hl=en
[78] *See, e.g.*, https://support.google.com/chromecast/answer/7071794?hl=en

District and elsewhere in the United States and causing the '106 Accused Products to be manufactured, used, sold, and offered for sale contribute to others' use and manufacture of the Accused Products, such that the '106 Patent is directly infringed by others. The accused components within the Accused Products including, but not limited to, software manufactured by Defendant, are material to the invention of the '106 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by Defendant to be especially made or adapted for use in the infringement of the '106 Patent. Defendant performs these affirmative acts with knowledge of the '106 Patent and with intent, or willful blindness, that they cause the direct infringement of the '106 Patent.

111.    Because of Defendant's direct and indirect infringement of the '106 Patent, FEC has suffered damages in an amount to be proven at trial.

<u>**COUNT III**</u>
**(Infringement of the '187 Patent)**

112.    Paragraphs 1 through 87 are incorporated by reference as if fully set forth herein.

113.    FEC has not licensed or otherwise authorized Defendant to make, use, offer for sale, sell, or import any products that embody the inventions of the '187 Patent.

114.    Defendant has and continues to directly infringe the claims of the '187 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, at least by making, using, offering to sell, selling, and/or importing into the United States products, such as the Accused Products, that satisfy each and every limitation of one or more claims of the '187 Patent, and by performing each and every step of one or more method claims of the '187 Patent.

115.    The Accused Products each perform the method of at least claim 15 of the '187 Patent: A method of exchanging contents, comprising the steps of: repeatedly transmitting

request information requiring response; receiving response information representing said response, transmitted in response to said request information; transmitting determination information for determining whether content data representing a content that is at least one of image and voice is to be an object of transmission or not, to the transmitter of said response information; transmitting said response information and said determination information to the transmitter of said request information; when said determination information is transmitted and determination information different from said transmitted determination information is received, determining whether said content data is to be transmitted, based on said transmitted determination information and said received determination information; transmitting the content data determined to be transmitted; when content data different from said transmitted content data is received, storing said received content data and determination information on said received content data; and outputting content based on the stored content data.

116.    The Accused Products perform a method of exchanging contents, comprising the step of repeatedly transmitting request information requiring response. For example, when a user initiates Quick Share (formerly known as "nearby share") on a Google Pixel 10 to share content, such as a photo or file, the Google Pixel 10 broadcasts a discovery signal repeatedly using Bluetooth Low Energy ("BLE"). The discovery signal contains an identifier and requests any nearby devices to respond.

For years -- years! -- iPhone owners have used AirDrop
to quickly and easily share files, photos, videos and
links with other nearby iPhones. By using AirDrop, you
don't have to fuss with texting a photo, compressing it
and ruining its overall quality, or clog up your
conversation thread with random links and files.

Now, Android phones are finally getting Google's
version of AirDrop, called Nearby Share.

[79]

But there are easier ways of transferring files and, on Android, Quick Share
reigns supreme. Formally called Nearby Share, Quick Share is Android's version
of AirDrop on the iPhone.

This feature looks for nearby devices and beam your photos, files and other
information across. It's also a default app, so you should have it on your Android
device ready to go. And all it takes is the tap of an icon to get started.

[80]

---

[79] https://www.cnet.com/tech/mobile/googles-version-of-iphone-airdrop-is-rolling-out-to-
android-phones-now-heres-how-to-use-the-new-feature/
[80] https://www.tomsguide.com/phones/how-to-use-quick-share-your-androids-equivalent-of-air-
drop

## 4. Find a device



(Image: © Future)

Your Android phone will scan for nearby devices but you will need to have a recipient device turned on and logged in.

When you see a device you wish to share with, just **tap that device** and the file will be transferred.

[81]

117.    The Accused Products perform the step of receiving response information representing said response, transmitted in response to said request information. For example, when a nearby device receives the BLE request from the Google Pixel 10 via Quick Share and accepts the Quick Share content, the nearby device sends a response that is received by the Google Pixel 10. The nearby device response includes information such as the device's name, user's contact information if available, etc.

---

[81] https://www.tomsguide.com/phones/how-to-use-quick-share-your-androids-equivalent-of-air-drop

## 4. Find a device



(Image: © Future)

Your Android phone will scan for nearby devices but you will need to have a recipient device turned on and logged in.

When you see a device you wish to share with, just **tap that device** and the file will be transferred.

[82]

---

[82] https://www.tomsguide.com/phones/how-to-use-quick-share-your-androids-equivalent-of-air-drop



If you've ever sent a photo in a text message, you're already a pro at using Nearby Share.

Screenshots by Jason Cipriani/CNET

83

118.    The Accused Products perform the step of transmitting determination information for determining whether content data representing a content that is at least one of image and voice is to be an object of transmission or not, to the transmitter of said response information. For example, after the Google Pixel 10 discovers the nearby device (i.e., the receiving device) and the user chooses that nearby device to receive content via Quick Share, the Google Pixel 10 sends determination information (e.g., a notification and/or transfer request) to the nearby Google device asking for permission to send content. In this example, Quick Share sets up an encrypted peer-to-peer connection and then the receiving device is presented with an Quick Share notification that includes details about the content and sender, along with Accept/Decline options.

---

[83] https://www.cnet.com/tech/mobile/googles-version-of-iphone-airdrop-is-rolling-out-to-android-phones-now-heres-how-to-use-the-new-feature/



If you've ever sent a photo in a text message, you're already a pro at using Nearby Share.

Screenshots by Jason Cipriani/CNET

84 https://www.cnet.com/tech/mobile/googles-version-of-iphone-airdrop-is-rolling-out-to-android-phones-now-heres-how-to-use-the-new-feature/

## Receive content on your Android device

With Quick Share, you can get content from other nearby devices.

Receive content through Quick Share     ∧

**Important:**

- If you share content between your own devices with the same Google Account, the device that receives the share automatically accepts the transfer.
- If you share content from the clipboard of your own device, the content is automatically copied when someone receives it.
- On both devices, be sure to turn on Bluetooth ✳ .
- To receive content from someone else, make sure your screen is unlocked.

1. On the Quick Share page, make sure it's in "Receive" mode.
   - When your device is in "Receive" mode, it's visible to anyone nearby when you're on that screen. To stop making your device visible to anyone nearby, exit "Receive" mode.

2. Wait for a pop up notification that tells you who's trying to share and what content they want to share with you.

3. Tap **Accept** or **Decline**.     [85]

119.     The Accused Products perform the step of transmitting said response information and said determination information to the transmitter of said request information. For example, in Quick Share, when the nearby device chooses to accept or decline, the nearby device sends a message back to the Google Pixel 10 communicating that decision. This message is the combination of the initial handshake context (e.g., the identity of the receiving device) and the determination result (e.g., whether the nearby device accepts or declines the content transfer request).

---

[85] https://support.google.com/android/answer/9286773?hl=en#zippy=%2Csend-content-through-quick-share%2Creceive-content-through-quick-share

# Send content on your Android device

With Quick Share, you can share content with other nearby devices.

### Send content through Quick Share  ⌄

**Important:** Make sure the device you want to share with is nearby.

1. On the Quick Share page, select the content that you want to share.
2. Tap the device you want to share with.
   - If you can't find the other device, make sure the other device is in "Receive" mode from the Quick Share page.
3. Wait for the other device to accept your sharing request.
   - Make sure the screen on the other device is unlocked.
   - To cancel an in-progress transfer, select the same device again.
4. During the transfer:
   - You can leave the screen and the transfer will continue.
   - You'll get a notification in your notification tray when you leave the sending screen. You can check the status, cancel, or go back to the transfer screen from the notification.
5. To select multiple receivers, you can tap more than one device.
   - Due to technical constraints, simultaneous sharing is only supported on selected device models.
   - In other cases, transfers will be queued and receivers you select later will get the transfer request when previous transfers are completed. [86]

---

[86] https://support.google.com/android/answer/9286773?hl=en#zippy=%2Csend-content-through-quick-share%2Creceive-content-through-quick-share



If you've ever sent a photo in a text message, you're already a pro at using Nearby Share.

Screenshots by Jason Cipriani/CNET

87

---

[87] https://www.cnet.com/tech/mobile/googles-version-of-iphone-airdrop-is-rolling-out-to-android-phones-now-heres-how-to-use-the-new-feature/

## Receive content on your Android device

With Quick Share, you can get content from other nearby devices.

Receive content through Quick Share                                    ⌃

**Important:**

- If you share content between your own devices with the same Google Account, the device that receives the share automatically accepts the transfer.
- If you share content from the clipboard of your own device, the content is automatically copied when someone receives it.
- On both devices, be sure to turn on Bluetooth ⁎ .
- To receive content from someone else, make sure your screen is unlocked.

1. On the Quick Share page, make sure it's in "Receive" mode.
   - When your device is in "Receive" mode, it's visible to anyone nearby when you're on that screen. To stop making your device visible to anyone nearby, exit "Receive" mode.

2. Wait for a pop up notification that tells you who's trying to share and what content they want to share with you.

3. Tap **Accept** or **Decline**.                                        [88]

120.    The Accused Products perform a method of exchanging contents when said determination information is transmitted and determination information different from said transmitted determination information is received, determining whether said content data is to be transmitted, based on said transmitted determination information and said received determination information. For example, after the sender has indicated the desire to send and the receiver has responded with accept or decline, the content is sent only if the receiver accepted. If the receiver declined, nothing is sent.

---

[88] https://support.google.com/android/answer/9286773?hl=en#zippy=%2Csend-content-through-quick-share%2Creceive-content-through-quick-share

## Send content on your Android device

With Quick Share, you can share content with other nearby devices.

Send content through Quick Share                                    ^

**Important:** Make sure the device you want to share with is nearby.

1. On the Quick Share page, select the content that you want to share.
2. Tap the device you want to share with.
   - If you can't find the other device, make sure the other device is in "Receive" mode from the Quick Share page.
3. Wait for the other device to accept your sharing request.
   - Make sure the screen on the other device is unlocked.
   - To cancel an in-progress transfer, select the same device again.
4. During the transfer:
   - You can leave the screen and the transfer will continue.
   - You'll get a notification in your notification tray when you leave the sending screen. You can check the status, cancel, or go back to the transfer screen from the notification.
5. To select multiple receivers, you can tap more than one device.
   - Due to technical constraints, simultaneous sharing is only supported on selected device models.
   - In other cases, transfers will be queued and receivers you select later will get the transfer request when previous transfers are completed.

[89]

121.     The Accused Products perform the step of transmitting the content data determined to be transmitted. For example, in Quick Share, once the receiver has accepted, the devices move on to transfer the file over a direct wireless link (Wi-Fi peer-to-peer).

---

[89] https://support.google.com/android/answer/9286773?hl=en#zippy=%2Csend-content-through-quick-share%2Creceive-content-through-quick-share

Quick Share searches for devices in close proximity, then chooses a protocol to use depending on what you're sending and what your connectivity is like. For example, it will use peer-to-peer Wi-Fi if you're completely offline, but other sharing protocols include Bluetooth, hot spot, WebRTC, and more. Here's how to make use of it. [90]

---

[90] https://www.wired.com/story/how-to-use-nearby-share-android/

## Send content on your Android device

With Quick Share, you can share content with other nearby devices.

**Send content through Quick Share** ^

**Important:** Make sure the device you want to share with is nearby.

1. On the Quick Share page, select the content that you want to share.
2. Tap the device you want to share with.
   - If you can't find the other device, make sure the other device is in "Receive" mode from the Quick Share page.
3. Wait for the other device to accept your sharing request.
   - Make sure the screen on the other device is unlocked.
   - To cancel an in-progress transfer, select the same device again.
4. During the transfer:
   - You can leave the screen and the transfer will continue.
   - You'll get a notification in your notification tray when you leave the sending screen. You can check the status, cancel, or go back to the transfer screen from the notification.
5. To select multiple receivers, you can tap more than one device.
   - Due to technical constraints, simultaneous sharing is only supported on selected device models.
   - In other cases, transfers will be queued and receivers you select later will get the transfer request when previous transfers are completed. [91]

122.     The Accused Products perform a method of exchanging contents when content data different from said transmitted content data is received, storing said received content data and determination information on said received content data. For example, on the Quick Share receiver's side, once a file is accepted and transferred, the content data (e.g., the file) is saved onto

---

[91] https://support.google.com/android/answer/9286773?hl=en#zippy=%2Csend-content-through-quick-share%2Creceive-content-through-quick-share

the device, and some determination information (e.g., metadata about that transfer) is also stored in the file system. By way of further example, if someone uses Quick Share to send a photo from a Photos app, it is saved in the Photos app of the receiving device.

## Send content on your Android device

With Quick Share, you can share content with other nearby devices.

Send content through Quick Share                                                          ⌃

**Important:** Make sure the device you want to share with is nearby.

1. On the Quick Share page, select the content that you want to share.
2. Tap the device you want to share with.
   - If you can't find the other device, make sure the other device is in "Receive" mode from the Quick Share page.
3. Wait for the other device to accept your sharing request.
   - Make sure the screen on the other device is unlocked.
   - To cancel an in-progress transfer, select the same device again.
4. During the transfer:
   - You can leave the screen and the transfer will continue.
   - You'll get a notification in your notification tray when you leave the sending screen. You can check the status, cancel, or go back to the transfer screen from the notification.
5. To select multiple receivers, you can tap more than one device.
   - Due to technical constraints, simultaneous sharing is only supported on selected device models.
   - In other cases, transfers will be queued and receivers you select later will get the transfer request when previous transfers are completed. [92]

---

[92] https://support.google.com/android/answer/9286773?hl=en#zippy=%2Csend-content-through-quick-share%2Creceive-content-through-quick-share

123.    The Accused Products perform the step of outputting content based on the stored content data. For example, with Quick Share, after the content data is saved on the receiving device, the content data is available for viewing or use on the receiving device.

For years -- years! -- iPhone owners have used AirDrop to quickly and easily share files, photos, videos and links with other nearby iPhones. By using AirDrop, you don't have to fuss with texting a photo, compressing it and ruining its overall quality, or clog up your conversation thread with random links and files.

Now, Android phones are finally getting Google's version of AirDrop, called Nearby Share.

[93]

124.    Defendant has and continues to indirectly infringe one or more claims of the '187 Patent by inducing infringement by others, such as Defendant's customers and end-users, in this District and elsewhere in the United States. For example, Defendant's customers and end-users directly infringe, either literally or under the doctrine of equivalents, through their use of the inventions claimed in the '187 Patent. Defendant induces this direct infringement through its affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the Accused Products, and providing instructions, documentation, and other information to customers and end-users suggesting that they use the Accused Products in an infringing manner, including technical support, marketing, product manuals, advertisements, and online documentation. [94]

---

[93] https://www.cnet.com/tech/mobile/googles-version-of-iphone-airdrop-is-rolling-out-to-android-phones-now-heres-how-to-use-the-new-feature/

[94] *See, e.g.*, https://support.google.com/android/answer/9286773?hl=en#zippy=%2Csend-content-through-quick-share%2Creceive-content-through-quick-share.

125.    Because of Defendant's inducement, Defendant's customers and end-users use the Accused Products in a way Defendant intends and they directly infringe the '187 Patent. Defendant performs these affirmative acts with knowledge of the '187 Patent and with the intent, or willful blindness, that the induced acts directly infringe the '187 Patent.

126.    Defendant has indirectly infringed and continues to indirectly infringe one or more claims of the '187 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such as customers and end-users, in this District and elsewhere in the United States. Defendant's affirmative acts of selling and offering to sell the '187 Accused Products in this District and elsewhere in the United States and causing the '187 Accused Products to be manufactured, used, sold, and offered for sale contribute to others' use and manufacture of the Accused Products, such that the '187 Patent is directly infringed by others. The accused components within the Accused Products including, but not limited to, software manufactured by Defendant, are material to the invention of the '187 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by Defendant to be especially made or adapted for use in the infringement of the '187 Patent. Defendant performs these affirmative acts with knowledge of the '187 Patent and with intent, or willful blindness, that they cause the direct infringement of the '187 Patent.

127.    Because of Defendant's direct and indirect infringement of the '187 Patent, FEC has suffered damages in an amount to be proven at trial.

## COUNT IV
### (Infringement of the '254 Patent)

128.    Paragraphs 1 through 87 are incorporated by reference as if fully set forth herein.

129.    FEC has not licensed or otherwise authorized Defendant to make, use, offer for sale, sell, or import any products that embody the inventions of the '254 Patent.

130.    Defendant has and continues to directly infringe the claims of the '254 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, at least by making, using, offering to sell, selling, and/or importing into the United States products, such as the Accused Products, that satisfy each and every limitation of one or more claims of the '254 Patent.

131.    The Accused Products comprise the elements of at least claim 1 of the '254 Patent: a control apparatus that is connected to a server device storing content and to a playback device, and controls playback of the content at the playback device, the control apparatus comprising: a receiver that receives the content from the server device; an analyzer that process at least one of video and audio of the content received by the receiver to determine a position of a chapter in the content; a determination component that determines a first playback position in the content based on the position of the chapter determined by the analyzer; and an electric controller that transmits to the playback device information about the first playback position in the content, the controller transmitting to the server device a content request for requesting the server device to send the content to the control apparatus in response to transmitting a playback instruction to the playback device to play the content at the playback device, the receiver receiving the content from the server device in parallel to the playback device receiving the content from the server device without going through the control apparatus in response to the playback instruction from the control apparatus, the analyzer processing the at least one of the video and audio of the content that has been received in response to the controller transmitting the content request to determine the position of the chapter in the content in parallel to the playback device playing the content that has been received from the server device without going through the control apparatus in response to the playback instruction from the control apparatus, the chapter including a first chapter and a second chapter,

the analyzer detecting a start position and an end position of a segment that satisfies a predetermined condition in the content as a position of the first chapter and a position of the second chapter, and the controller transmitting to the playback device the position of the second chapter as the information about the first playback position when information about a playback position of the content at the playback device received by the receiver matches the position of the first chapter.

132.    The Accused Products comprise a control apparatus that is connected to a server device storing content and to a playback device, and controls playback of the content at the playback device. For example, the Accused Products comprise a control apparatus (e.g., Google Cast and/or a device running the Google Cast application, YouTube TV app and/or a device running the YouTube TV app) that is connected to a server device (e.g., Google's servers, Google's cloud server, etc.) storing content (e.g., videos files, livestreams, etc.) and to a playback device (e.g., smart television, mobile device, etc.), and controls playback of the content at the playback device.



## Introducing Google Cast

**Google Cast delivers multi-screen TV and audio experiences with speakers.**

Casting is as simple as pressing a button from your favorite app. Watch your favorites on the TV while switching to another app. Listen to your top tunes while taking a phone call or sending a text, all without interrupting what's playing on the speakers.

With Cast, your phone is your personalized remote control that you can use to browse, play, pause, and even make playlists.

You can cast from Android tablets and smartphones, iPhones, iPads, Mac, Windows and Chromebooks to your TV or speakers.

**Supported Devices** [95]

133.    The Accused Products comprise a receiver that receives the content from the server device. For example, Google Cast application includes a receiver component that is responsible for fetching streaming content. The receiver obtains video and audio streams from Google's content delivery network servers.

---

[95] https://support.google.com/googlecast/answer/6102923?hl=en

✓ **Up next notification**

Up Next notifications alert users of upcoming content. This is not necessary for all content types, but is especially helpful for episodic playback, so users don't accidentally watch a whole season. The receiver displays a countdown timer and the sender displays a static "Up Next" message to prevent timing issues. The Up Next notification should appear at least 30 seconds before the end of the video or immediately when the credits start.

Sender up next                    Receiver up next




**Required**

Up Next notifications include three key actions:

A  Wait = Waiting till the current content ends (for example, 30 sec) will start playback of the item Up Next

B  Play = Immediately starts playback of content Up Next                    96

134.    The Accused Products comprise an analyzer that processes at least one of video and audio of the content received by the receiver to determine a position of a chapter in the content. For example, Google Cast comprises an analyzer that determines the duration of a credits section of a television show in case a user would like to skip the credits.

---

96 https://developers.google.com/cast/docs/design_checklist/cast-autoplay

✓ **Up next notification**

Up Next notifications alert users of upcoming content. This is not necessary for all content types, but is especially helpful for episodic playback, so users don't accidentally watch a whole season. The receiver displays a countdown timer and the sender displays a static "Up Next" message to prevent timing issues. The Up Next notification should appear at least 30 seconds before the end of the video or immediately when the credits start.

*Sender up next*                                      *Receiver up next*



**Required**

Up Next notifications include three key actions:

**A**   Wait = Waiting till the current content ends (for example, 30 sec) will start playback of the item Up Next

**B**   Play = Immediately starts playback of content Up Next                    97

135.    The Accused Products comprise a determination component that determines a first playback position in the content based on the position of the chapter determined by the analyzer. For example, Google Cast determines a first playback position (e.g., timestamp) in the content (e.g., video file, audio file, etc.) based on the position of the chapter determined by the analyzer (e.g., the beginning and ending of a show's credit sequence).

---

97 https://developers.google.com/cast/docs/design_checklist/cast-autoplay

✓ **Up next notification**

Up Next notifications alert users of upcoming content. This is not necessary for all content types, but is especially helpful for episodic playback, so users don't accidentally watch a whole season. The receiver displays a countdown timer and the sender displays a static "Up Next" message to prevent timing issues. The Up Next notification should appear at least 30 seconds before the end of the video or immediately when the credits start.

Sender up next                  Receiver up next



**Required**

Up Next notifications include three key actions:

**A**  Wait = Waiting till the current content ends (for example, 30 sec) will start playback of the item Up Next

**B**  Play = Immediately starts playback of content Up Next                    98

136.    The Accused Products comprise an electric controller that transmits to the playback device information about the first playback position in the content. For example, in the Google Cast application, and electric controller is responsible for transmitting playback-related metadata (e.g., a flag indicating whether the "Up Next" feature is available for the current title, along with a first playback position, such as the timestamp marking the end of the credit section, or the timestamp for the beginning of the next video file, to which the playback should jump) to the

---

98 https://developers.google.com/cast/docs/design_checklist/cast-autoplay

playback device.

✓ **Up next notification**

Up Next notifications alert users of upcoming content. This is not necessary for all content types, but is especially helpful for episodic playback, so users don't accidentally watch a whole season. The receiver displays a countdown timer and the sender displays a static "Up Next" message to prevent timing issues. The Up Next notification should appear at least 30 seconds before the end of the video or immediately when the credits start.

*Sender up next*                    *Receiver up next*



**Required**

Up Next notifications include three key actions:

  **A**  Wait = Waiting till the current content ends (for example, 30 sec) will start playback of the item Up Next

  **B**  Play = Immediately starts playback of content Up Next                    99

137.    The Accused Products comprise the controller transmitting to the server device a content request for requesting the server device to send the content to the control apparatus in response to transmitting a playback instruction to the playback device to play the content at the playback device. For example, when a user initiates playback of a selected title, the control apparatus (e.g., Google Cast app) comprises a controller that sends a playback instruction to the

---

99 https://developers.google.com/cast/docs/design_checklist/cast-autoplay

playback device to begin streaming. In response to this instruction, the controller also transmits content to the server device (e.g., Google's servers) asking the server to deliver the corresponding video and audio segments required for playback. These content segments are streamed from the server device to the control apparatus and/or playback device.





100

---

✓ **Up next notification**

Up Next notifications alert users of upcoming content. This is not necessary for all content types, but is especially helpful for episodic playback, so users don't accidentally watch a whole season. The receiver displays a countdown timer and the sender displays a static "Up Next" message to prevent timing issues. The Up Next notification should appear at least 30 seconds before the end of the video or immediately when the credits start.

Sender up next                    Receiver up next



**Required**

Up Next notifications include three key actions:

**A**  Wait = Waiting till the current content ends (for example, 30 sec) will start playback of the item Up Next

**B**  Play = Immediately starts playback of content Up Next                    101

138.    The Accused Products comprise the receiver receiving the content from the server device in parallel to the playback device receiving the content from the server device without going through the control apparatus in response to the playback instruction from the control apparatus. For example, when content playback is initiated, the control apparatus (e.g., Google Cast app) sends a playback instruction to begin streaming. In response, the receiver fetches playback-related metadata and manifest files directly from part of the server device (e.g., Google's servers).

---

[101] https://developers.google.com/cast/docs/design_checklist/cast-autoplay

Simultaneously, the playback device receives the actual media content video and audio chunks from Google's servers. By way of further example, features like "Up Next" continue to function in the background of the Google Cast app, showing that parallel processing is active while content is being streamed.

✓ **Up next notification**

Up Next notifications alert users of upcoming content. This is not necessary for all content types, but is especially helpful for episodic playback, so users don't accidentally watch a whole season. The receiver displays a countdown timer and the sender displays a static "Up Next" message to prevent timing issues. The Up Next notification should appear at least 30 seconds before the end of the video or immediately when the credits start.

*Sender up next*                              *Receiver up next*



**Required**

Up Next notifications include three key actions:

A   Wait = Waiting till the current content ends (for example, 30 sec) will start playback
of the item Up Next

B   Play = Immediately starts playback of content Up Next                    102

139.    The Accused Products comprise the analyzer processing the at least one of the video and audio of the content that has been received in response to the controller transmitting the content

---

[102] https://developers.google.com/cast/docs/design_checklist/cast-autoplay

request to determine the position of the chapter in the content in parallel to the playback device playing the content that has been received from the server device without going through the control apparatus in response to the playback instruction from the control apparatus. For example, when a user taps "Play" in the Google Cast app, the control apparatus (e.g., Google Cast app) sends a content request to Google's backend servers. In response, the playback device begins receiving video and audio streams from the server device, without routing through the Google Cast control logic. Playback starts nearly instantly. Simultaneously, on information and belief, the "Up Next" analyzer begins working in the background to process the video and audio. The analyzer determines the position of the chapter in the content (e.g., determine the credit segment boundaries). This analysis is conducted in parallel with content playback.

✓ **Up next notification**

Up Next notifications alert users of upcoming content. This is not necessary for all
content types, but is especially helpful for episodic playback, so users don't accidentally
watch a whole season. The receiver displays a countdown timer and the sender displays
a static "Up Next" message to prevent timing issues. The Up Next notification should
appear at least 30 seconds before the end of the video or immediately when the credits
start.

*Sender up next*    *Receiver up next*



**Required**

Up Next notifications include three key actions:

  **A**  Wait = Waiting till the current content ends (for example, 30 sec) will start playback
of the item Up Next
  **B**  Play = Immediately starts playback of content Up Next                103

140.    The Accused Products comprise the chapter including a first chapter and a second

chapter. For example, every television episode is typically structured within the Google Cast app

with a clearly defined credits segment, such as with theme music or contributory content. The

analyzer identifies two timestamp markers: one that indicates the end of the first chapter and

beginning of the second chapter (e.g., the main content ends and credits begin) and another that

marks the end of the second chapter (e.g., when the credits end).

---

103 https://developers.google.com/cast/docs/design_checklist/cast-autoplay

✓ **Up next notification**

Up Next notifications alert users of upcoming content. This is not necessary for all content types, but is especially helpful for episodic playback, so users don't accidentally watch a whole season. The receiver displays a countdown timer and the sender displays a static "Up Next" message to prevent timing issues. The Up Next notification should appear at least 30 seconds before the end of the video or immediately when the credits start.

Sender up next

Receiver up next




**Required**

Up Next notifications include three key actions:

**A**  Wait = Waiting till the current content ends (for example, 30 sec) will start playback of the item Up Next

**B**  Play = Immediately starts playback of content Up Next                104

141.    The Accused Products comprise the analyzer detecting a start position and an end position of a segment that satisfies a predetermined condition in the content as a position of the first chapter and a position of the second chapter. For example, as mentioned above, the analyzer identifies a start position and an end position of a segment, such as two timestamp markers: one that indicates the end of the first chapter and beginning of the second chapter (e.g., the main content ends and credits begin) and another that marks the end of the second chapter (e.g., when the credits end).

---

104 https://developers.google.com/cast/docs/design_checklist/cast-autoplay

✓ **Up next notification**

Up Next notifications alert users of upcoming content. This is not necessary for all content types, but is especially helpful for episodic playback, so users don't accidentally watch a whole season. The receiver displays a countdown timer and the sender displays a static "Up Next" message to prevent timing issues. The Up Next notification should appear at least 30 seconds before the end of the video or immediately when the credits start.

*Sender up next*                    *Receiver up next*



**Required**

Up Next notifications include three key actions:

**A**   Wait = Waiting till the current content ends (for example, 30 sec) will start playback of the item Up Next

**B**   Play = Immediately starts playback of content Up Next       105

142.    The Accused Products comprise the controller transmitting to the playback device the position of the second chapter as the information about the first playback position when information about a playback position of the content at the playback device received by the receiver matches the position of the first chapter. For example, as the playback on the Google Cast app progresses through the episode, it continually tracks the current playback position. When this playback position aligns with the timestamp corresponding to the end of the position of the first

---

[105] https://developers.google.com/cast/docs/design_checklist/cast-autoplay

chapter (e.g., the end of the main content section), the Google Cast app detects this match and displays the "Up Next" button on the playback interface. If the viewer opts to skip by selecting the button, the controller sends a command to the playback device, instructing it to jump to the position of the second chapter (e.g., the credits end timestamp), bypassing the credits segment.

✓ **Up next notification**

Up Next notifications alert users of upcoming content. This is not necessary for all content types, but is especially helpful for episodic playback, so users don't accidentally watch a whole season. The receiver displays a countdown timer and the sender displays a static "Up Next" message to prevent timing issues. The Up Next notification should appear at least 30 seconds before the end of the video or immediately when the credits start.



*Sender up next*          *Receiver up next*

**Required**

Up Next notifications include three key actions:

**A**  Wait = Waiting till the current content ends (for example, 30 sec) will start playback of the item Up Next
**B**  Play = Immediately starts playback of content Up Next                    106

143.     Defendant has and continues to indirectly infringe one or more claims of the '254 Patent by inducing infringement by others, such as Defendant's customers and end-users, in

---

[106] https://developers.google.com/cast/docs/design_checklist/cast-autoplay

this District and elsewhere in the United States. For example, Defendant's customers and end-users directly infringe, either literally or under the doctrine of equivalents, through their use of the inventions claimed in the '254 Patent. Defendant induces this direct infringement through its affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the Accused Products, and providing instructions, documentation, and other information to customers and end-users suggesting that they use the Accused Products in an infringing manner, including technical support, marketing, product manuals, advertisements, and online documentation.[107]

144.    Because of Defendant's inducement, Defendant's customers and end-users use the Accused Products in a way Defendant intends and they directly infringe the '254 Patent. Defendant performs these affirmative acts with knowledge of the '254 Patent and with the intent, or willful blindness, that the induced acts directly infringe the '254 Patent.

145.    Defendant has indirectly infringed and continues to indirectly infringe one or more claims of the '254 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such as customers and end-users, in this District and elsewhere in the United States. Defendant's affirmative acts of selling and offering to sell the '254 Accused Products in this District and elsewhere in the United States and causing the '254 Accused Products to be manufactured, used, sold, and offered for sale contribute to others' use and manufacture of the Accused Products, such that the '254 Patent is directly infringed by others. The accused components within the Accused Products including, but not limited to, software manufactured by Defendant, are material to the invention of the '254 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by Defendant to be especially made or adapted for use in the infringement of the '254 Patent. Defendant performs

---

[107] *See, e.g.,* https://developers.google.com/cast/docs/design_checklist/cast-autoplay.

these affirmative acts with knowledge of the '254 Patent and with intent, or willful blindness, that they cause the direct infringement of the '254 Patent.

146.    Because of Defendant's direct and indirect infringement of the '254 Patent, FEC has suffered damages in an amount to be proven at trial.

### COUNT V
### (Infringement of the '847 Patent)

147.    Paragraphs 1 through 87 are incorporated by reference as if fully set forth herein.

148.    FEC has not licensed or otherwise authorized Defendant to make, use, offer for sale, sell, or import any products that embody the inventions of the '847 Patent.

149.    Defendant has and continues to directly infringe the claims of the '847 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, at least by making, using, offering to sell, selling, and/or importing into the United States products, such as the Accused Products, that satisfy each and every limitation of one or more claims of the '847 Patent.

150.    The Accused Products comprise the device of at least claim 1 of the '847 Patent: An information device comprising: a communication component that communicates with an external device; and a controller that downloads video data from the external device through the communication component, performs processing to convert a format of the video data into a playable format and executes an application for playing the video data, the controller sending a download request for each divided video data to sequentially download the divided video data, with the divided video data being obtained by dividing up the video data, the processing by the controller to convert the format of the video data into the playable format including dividing the divided video data into a plurality of divided files and producing a playlist file for a playback instruction of the divided files every time the divided video data is downloaded.

151.    The Accused Products comprise an information device. For example, the Google Meet app includes information devices (e.g., GGC servers) that deliver, store, and analyze content like livestream and recorded videos and audio.

Computer    Android    iPhone & iPad

### Set up a live stream with Google Meet

1. In a meeting, at the bottom right, click Activities ⚄ › **Live Streaming** › **Stream internally**.

**Tip:** The live stream is only accessible to guests within your organization. Reach out to your Workspace Admins to set up Cross Domain live streaming.

2. In the menu, select the language for captions.
3. Click **Start Streaming**.
4. Share the live stream through a Copy streaming link.

**Tip:** If you share the meeting code or URL, the user joins as a participant.

### Set up a live stream with Google Calendar



### Part 1: Create a live stream event

1. Open Google Calendar ↗ .
2. Click Create ➕ › Event › **More options**.
3. Add the event details, such as date, time, and description.
4. Add the guests that can fully participate in the video meeting.
   - All guests added to this event can be seen, heard, and present their screen.
   - People from other organizations and trusted domains can be added. Only people in your organization can record and control streaming.
5. Next to **Join with Google Meet**, click the Down arrow ⌄ › **Add live stream**.
6. Click **Save** › **Send**.    108

---

108 https://support.google.com/meet/answer/9308630?hl=en&co=GENIE.Platform%3DDesktop

152.    The Accused Products comprise a communication component that communicates with an external device. For example, the servers that are a part of Google's Content Delivery Network ("CDN") include communication components (e.g., GGC network controllers) that establish and maintain communication with edge servers or playback devices.

## How Media CDN works

Media CDN has three major components:

- A router

- A cache

- A cache filler

Conceptually, the components are connected as depicted in the following diagram:



**Figure 1.** *Media CDN components.*                    109

153.    The Accused Products comprise a controller that downloads video data from the external device through the communication component, performs processing to convert a format of the video data into a playable format and executes an application for playing the video data. For example, a network controller downloads video data (e.g., a request to watch a livestream or recording) from the external device (e.g., a user device) through the communication component of Google's network, the controller downloads the requested content into a playable format for the external device to play the requested content.

---

[109] https://cloud.google.com/media-cdn/docs/overview

**In Google Drive**

Recordings save to the meeting organizer's My Drive > Meet Recordings folder. However, if the organizer changes or if the meeting occurs outside of the scheduled Calendar time, the recording link is sent to the original event creator.

To share a recording:

1. Select the file ⟩ Share 👤₊.
2. Or, click Link 🔗 ⟩ paste the link in an email or chat message.

For best results, download the recording and then play it from your computer:

1. Select the file and click More ⋮ ⟩ Download ⬇.
2. Double-click the downloaded file to play it.
   • In Drive, double-click the recording to play it. "Still processing" appears until the file is ready for online viewing.

To add a recording to My Drive, select the file and click Add to My Drive 🗁₊.

**From an email link**

An email with the recording link is sent to the meeting organizer and the person who started the recording.

1. In the email, click the link and wait for the recording to open.
2. Select an option:
   • To play the recording, click Play 🗁₊.
   • To share the recording, click More ⋮ ⟩ Share. Enter usernames or email addresses and click Done.

**Tip:** You can also copy and share a link.

To download the file, click **Download**

To add the recording to the current folder, click Add to My Drive 🗁₊.

**In the Google Calendar event**

If the recording starts at the scheduled meeting time, the recording links to the Google Calendar event. Individual meeting participants in the same organization as the meeting organizer automatically get access to the recording. Groups don't automatically get access.

110

154.    The Accused Products comprise the controller sending a download request for each divided video data to sequentially download the divided video data, with the divided video data being obtained by dividing up the video data. For example, Google encodes each video data into small "chunks" (typically 2-6 seconds in length). The Google controller sends a download request for each chunk to sequentially download the chunked video data.

---

[110] https://support.google.com/meet/answer/9308681?hl=en#zippy=%2Cplay-share-download-or-save-a-recording

## What sites use WebRTC?

WebRTC is widely used and many mainstream applications rely on it to facilitate their livestreaming and real-time communication features. Google Hangouts, Google Meet, Facebook Messenger, Discord and Houseparty are just a few examples of sites that use WebRTC.

[111]

---

[111] https://riverside.com/blog/webrtc-video-streaming#:~:text=easy%20to%20use-,What%20is%20WebRTC?,the%20foundational%20elements%20of%20RTC

**Key Technology Drivers:**

- **Smarter Congestion Control** – Thompson Sampling and Multi-Armed Bandit algorithms improve adaptive bitrate selection and flow stability.
- **Watermark-Based Jitter Management** – WMJitter and watermark-assisted out-of-order handling reduce packet delay variations.
- **AI-Optimized Devices** – EfficientNet-Lite and sparse neural networks enable high-quality effects on low-power or commodity hardware.
- **Edge Computing & eCDN** – Enterprise Content Delivery Networks and edge nodes bring processing closer to users for faster responsiveness.
- **Network Intelligence** – Operator-level visibility via Network Intelligence Centers supports real-time diagnostics and predictive stream optimization.



## Real-time audio and video synchronization

Maintaining precise audio-video sync is critical in video conferencing, as even small drifts can disrupt conversations and user experience. Google Meet and similar platforms deploy advanced synchronization mechanisms to ensure natural communication.

Key Synchronization Techniques:

- **Timestamp Alignment** – Embedding accurate timestamps into audio and video packets ensures playback in sync.
- **Adaptive Jitter Buffers** – Dynamically adjust playback delay to handle network variability while keeping lip-sync intact.
- **Secure RTP (SRTP) over UDP** – Protects data while enabling real-time, low-latency audio and video transport.
- **Codec Rate Modulation** – Video codecs adapt bitrate and frame rate to maintain smooth sync under network fluctuations.
- **Buffer-Based & Adaptive Streaming** – Techniques like buffer smoothing reduce drift while preserving HD image clarity.

112

155.    The Accused Products comprise the processing by the controller to convert the format of the video data into the playable format including dividing the divided video data into a plurality of divided files and producing a playlist file for a playback instruction of the divided files

---

[112] https://www.frugaltesting.com/blog/inside-google-meet-how-low-latency-architecture-powers-video-quality#:~:text=Uses%20WebRTC%20over%20UDP%20to,RTMP%20for%20real%2Dtime%20streaming

every time the divided video data is downloaded. For example, Google's OCNs serve as caching servers that store video segments and playlists for producing playback instructions upon download.



## How Media CDN works

Media CDN has three major components:

- A router
- A cache
- A cache filler

Conceptually, the components are connected as depicted in the following diagram:

**Figure 1.** Media CDN components.                                                113

156.    Defendant has and continues to indirectly infringe one or more claims of the '847 Patent by inducing infringement by others, such as Defendant's customers and end-users, in this District and elsewhere in the United States. For example, Defendant's customers and end-users directly infringe, either literally or under the doctrine of equivalents, through their use of the inventions claimed in the '847 Patent. Defendant induces this direct infringement through its affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the Accused Products, and providing instructions, documentation, and other information to customers and end-users suggesting that they use the Accused Products in an infringing manner, including technical support, marketing, product manuals, advertisements, and online documentation.[114]

---

[113] https://cloud.google.com/media-cdn/docs/overview
[114] *See, e.g.*, https://support.google.com/meet/answer/9308630?hl=en&co=GENIE.Platform%3DDesktop

157.     Because of Defendant's inducement, Defendant's customers and end-users use the Accused Products in a way Defendant intends and they directly infringe the '847 Patent. Defendant performs these affirmative acts with knowledge of the '847 Patent and with the intent, or willful blindness, that the induced acts directly infringe the '847 Patent.

158.     Defendant has indirectly infringed and continues to indirectly infringe one or more claims of the '847 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such as customers and end-users, in this District and elsewhere in the United States. Defendant's affirmative acts of selling and offering to sell the '847 Accused Products in this District and elsewhere in the United States and causing the '847 Accused Products to be manufactured, used, sold, and offered for sale contribute to others' use and manufacture of the Accused Products, such that the '847 Patent is directly infringed by others. The accused components within the Accused Products including, but not limited to, software manufactured by Defendant, are material to the invention of the '847 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by Defendant to be especially made or adapted for use in the infringement of the '847 Patent. Defendant performs these affirmative acts with knowledge of the '847 Patent and with intent, or willful blindness, that they cause the direct infringement of the '847 Patent.

159.     Because of Defendant's direct and indirect infringement of the '847 Patent, FEC has suffered damages in an amount to be proven at trial.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury for all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, FEC prays for relief against Defendant as follows:

a.      Entry of judgment declaring that Defendant has directly and/or indirectly infringed one or more claims of each of the Patents-in-Suit;

b.      An order pursuant to 35 U.S.C. § 283 permanently enjoining Defendant, their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them, from further acts of infringement of the Patents-in-Suit;

c.      An order awarding damages sufficient to compensate FEC for Defendant's infringement of the Patents-in-Suit, but in no event less than a reasonable royalty, together with interest and costs;

d.      Entry of judgment declaring that Defendant's infringement has been willful and awarding FEC treble damages pursuant to 35 U.S.C. § 284; and

e.      Entry of judgment declaring that this case is exceptional and awarding FEC its costs and reasonable attorney fees under 35 U.S.C. § 285; and

f.      Such other and further relief as the Court deems just and proper.


Dated:  October 30, 2025                    Respectfully submitted,

                                            */s/ Vincent J. Rubino, III*
                                            Vincent J. Rubino, III
                                            NY Bar No. 4557435
                                            Email: vrubino@fabricantllp.com
                                            Alfred R. Fabricant
                                            NY Bar No. 2219392
                                            Email: ffabricant@fabricantllp.com
                                            Peter Lambrianakos
                                            NY Bar No. 2894392
                                            Email: plambrianakos@fabricantllp.com
                                            Jacob Ostling
                                            NY Bar No. 5684824
                                            Email: jostling@fabricantllp.com

**FABRICANT LLP**
411 Theodore Fremd Avenue
Suite 206 South
Rye, New York 10580
Telephone: (212) 257-5797
Facsimile: (212) 257-5796

***ATTORNEYS FOR PLAINTIFF
FEC IP LLC***